**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ALEXANDER MARCANO,**

                                        **Plaintiff,**

                                                                    **1:12-CV-00036**

        **-against-**

**THE CITY OF SCHENECTADY, MICHAEL
HUDSON, RYAN KENT, ANTHONY J.
SAVIGNANO, KEVIN DERKOWSKI, SHAWN
DONOVAN, WILLIAM FENNELL, BRET
FERRIS, JEFFREY S. PARDI, CHRISTOPHER
SEMIONE, and STEVEN SHELDON, Individually
and as Agents, Servants, and/or Employees and
Police Officers of the City of Schenectady and the
City of Schenectady Police Department,**

                                        **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

                            **DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiff Alexander Marcano ("Plaintiff") commenced this action on January 9, 2012

alleging violations of  rights secured by the United States Constitution and New York State

law.  His claims, which arise  in connection with his arrest on January 7, 2011, sound in

false arrest, malicious prosecution, malicious abuse of process, excessive force,

intentional and negligent infliction of emotional distress, assault and battery, and

negligence.

        Presently before the Court are Plaintiff's motion for partial summary judgment, dkt.

# 50, and Defendants' cross-motion for summary judgment. Dkt. # 56.  The Court has

considered all of the submissions presented by the parties relative to these motions in rendering this Decision and Order.

## II.    STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, see Scott v. Harris, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011).  When considering cross-motions for summary judgment, the Court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002)(citation omitted).   "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it . . . [and] a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

## III.    BACKGROUND[1]

---

[1]Unless indicated otherwise, the facts set forth above are taken from the parties' Local Rule 7.1(a)(3) Statements of Material Facts and are admitted by the opposing party, properly supported by the record, or deemed admitted for failing to provide proper factual opposition. See Local Rule 7.1(a)(3).  The acronyms used to designate the parties' Local Rule 7.1(a)(3) Statements are: "PSOF" for Plaintiff's Statement of Facts Not In Dispute; "DRPSOF" for Defendants' Response to Plaintiff's Statement of Facts; "DCSOF" for Defendants' Counter-Statement of Material Facts; and "PRDCSOF" for Plaintiff's Response to Defendants'
(continued...)

On January 7, 2011, at approximately 7:50 P.M., the Schenectady Police Department's Special Investigation Unit ("SIU") received a complaint that a black male had brandished a gun at a location on Paige Street. Hudson Dep. p. 23; Savignano Dep., pp. 34, 36. The SIU called in the complaint to the police department. Hudson Dep. p. 28; Savignano Dep., p. 37. The police dispatcher, in turn, instructed "all units" to respond, and indicated that the "perpetrator," a black male with a gun, had jumped over a fence around 501-503 Paige Street and was headed towards Mumford Street. See In-Cruiser Video ("ICV") recordings, Def. Ex. 1. Defendants Savignano and Hudson, both Schenectady police officers, were on duty in the City of Schenectady and responded by driving in their police cruiser to Mumford Street, arriving moments after they received the dispatch. Id.

At the time, it was dark out, it was snowing, the roadways were covered with snow, and there were very few people on the streets. Id., at 007KVY00. Driving down Mumford Street from Strong Street, the officers passed a man shoveling snow on the left side of the street. They asked if he had "just seen a black guy come through here," and received a negative response. Id. Continuing down the street, the officers saw a lone individual (later identified as Plaintiff) walking on the right side of Mumford Street (the side closest to Paige Street) moving toward them and away from the corresponding address on Mumford Street where the suspect had allegedly jumped over the fence. Id. Savignano attests that when he first observed Plaintiff, he could tell he was either a black or Hispanic male because of his dark skin tone. Savignano Dep. 39. At that time, Plaintiff was not engaged in any illegal or suspicious behavior beyond the possibility that he was the individual who had

---

[1](...continued)
Counter-Statement of Material Facts.

brandished a gun on Paige Street. Although no weapon was observed, Savignano testified that he "couldn't see [Plaintiff's] hands." DRPSOF ¶ 8.[2]

Hudson and Savignano decided to approach Plaintiff because he matched the dispatcher's description, was one of the few individuals on Mumford Street during the snow storm, was near where the incident allegedly occurred, and was walking away from where the suspect reportedly jumped over the fence to Mumford Street. The officers shined the vehicle's spotlight on Plaintiff, pulled their car to the side of the street adjacent to where Plaintiff was walking, and both officers exited the vehicle.[3] The In-Cruiser Video/Audio recording indicates that, although out of sight of the video recording (which only displays events in front of the vehicle), Savignano[4] can be heard stating: "37.[5] Let me see your hands. Let me . . . ." Def. Ex.1, 007KVY00. At this point Plaintiff began to flee from the police, apparently attempting to run down a driveway headed toward Paige Street. PSOF ¶¶ 12-15;[6] PRDCSOF at ¶14. Both officers gave chase and, in a matter of

---

[2]Defendants attribute both the snowfall and the general dark of the street to their inability to see Plaintiff's hands. However, Plaintiff states that when the officers first encountered him he was walking between two streets lights, in front of a home with an outside light, which combined with the officers car's headlights and their spotlight, should have made visibility issues negligible.

[3]Officer Hudson contends that he first said something to the effect of "hold up a sec" or "stop." Although perhaps muffled, the In-Cruiser Video recording does not clearly indicate that this was stated.

[4]Officer Hudson testified that only Officer Savignano was equipped with a microphone that night. Hudson Dep., p. 21.

[5] "37" is announced before Officer Savignano makes statements that are transmitted over his microphone.

[6]In his Statement of Material Facts, Plaintiff asserts that "Defendants Savignano and Hudson claim to have told Mr. Marcano to stop, and *immediately* began chasing him." (PSOF ¶ 12)(emphasis added); "Mr. Marcano fled from Defendants Savignano and Hudson." (PSOF ¶ 13); "[T]he reason that he fled . . . was that one of the officers . . . resembled an officer . . . who had threatened [him]." (PSOF ¶ 14).

While Plaintiff first asserts that he was being chased and then asserts that he fled, this is simply a matter of semantics. Plaintiff was approaching the officers at the time they existed their vehicle, so he must necessarily have been moving away from, *i.e.*, fleeing from, the officers in order for them to have "chased" him.

moments, both officers and Plaintiff fell on ice. Hudson grabbed Plaintiff's foot but Plaintiff

was able to get away. See PSOF ¶ 15 ("Within moments, Defendant Hudson grabbed Mr.

Marcano by the foot but was unable to keep hold ...." ). Plaintiff then turned back across

Mumford Street and continued to flee with Hudson and Savignano in pursuit. The In-

Cruiser Video recording depicts Plaintiff fleeing in front of the vehicle and running to the

opposite side of Mumford Street with the officers in close pursuit. See Def. Ex.1,

007KVY00 (starting) at 14:01:23. It is clear in the video recording that Plaintiff was

running with his left hand held on or at his left hip near the waist band of his pants, and the

next recorded statement, which occurs as the officers run past the camera, provides: "37.

In foot pursuit. On Mumford. Back yard. Grabbing his waistband. Going toward Summit."

Id.

        Hudson and Savignano testified that Plaintiff's unprovoked flight and the fact that

he was seen reaching for his waistband, as well as their experience in the field,

heightened their suspicion that Plaintiff had been involved in the Paige Street incident and,

therefore, could be armed. Savignano Dep., pg. 46; Hudson Dep., pg. 27. Hudson and

Savignano pursued Plaintiff across Mumford Street and down a driveway of an adjacent

residence. There, the officers lost track of Plaintiff and thought that Plaintiff had gone into

a residence at 516 Mumford Street. Hudson went to the back of the residence looking for

Plaintiff while Savignano went to the front. Savignano radioed for back-up and, when

Hudson spotted Plaintiff running through the yards behind the residences on Mumford and

Summit Streets, directed that a perimeter of officers be set around the area to aid in

apprehending Plaintiff. PSOF at ¶ 15. Plaintiff continued to flee by running through the

backyards and jumping over at least one chain-link fence. DCSOF ¶¶ 24, 27.[7]

Defendants claim that during the chase, Hudson instructed Plaintiff to stop running and to let the officers see his hands; Marcano denies that Hudson gave such an order. The officers further allege that during the chase Plaintiff kept reaching for his waistband, but Plaintiff alleges that he reached for his waistband only when he crossed Mumford Street. <u>Compare</u> DCSOF at ¶14; PRDCSOF at ¶14. During the chase, Savignano used his radio to communicate with other officers. Savignano communicated Plaintiff's direction of travel, his description, and an indication that Plaintiff was seen reaching for his waistband. DRPSOF ¶ 19.

Hudson chased Plaintiff through several backyards in an attempt to apprehend him, but Plaintiff jumped over a fence and escaped the immediate pursuit. Hudson cut his hand attempting to also jump over the chain-link fence, and the injury later required stitches to close a laceration. DCSOF ¶ 26.

Plaintiff was eventually found hiding beneath a tree under foliage in a vacant yard behind the chain link fence that he had jumped over. <u>See</u> Hudson Dep. pp. 31-35. Defendant Pardi first located Plaintiff, shined his flashlight at Plaintiff, drew his weapon, and said: "Freeze. Don't you fucking move or I'll blow your fucking head off." Pardi Dep. at 30; PSOF at ¶ 23; DRPSOF at ¶ 23. Pardi then took refuge behind a garage so as to ensure his safety if a gun battle ensured. Defendants contend that when Pardi found Plaintiff, Plaintiff was already bleeding from the head.

Hudson then caught up with Plaintiff, slid into him "baseball style," "grabbed [Plaintiff's left] arm as soon as he could," and "tried to attempt to control [Plaintiff] as best

---

[7]Hudson testified that in addition to jumping over the chain link fence, he saw Plaintiff go through a hole in a stockade-style fence.

that [he could]." Hudson Dep. pp. 35-37. Hudson held Plaintiff against the tree in an effort to prevent him from escaping but, Defendants contend, Plaintiff struggled with Hudson and attempted to pull away. Officers Savignano, Donovan, Semione, Fennell, Ferris, Derkowski and Kent arrived and aided in Plaintiff's apprehension. Defendants contend that Plaintiff refused to comply with verbal commands issued by numerous officers to show them his hands and come out of the bushes, requiring his physical removal. See Savignano Dep., p. 57. Defendants also contend that Plaintiff resisted having his hands cuffed. Hudson Dep. p. 40.

Plaintiff alleges that while Hudson held his arm, Derkowski and Pardi held their guns on him; Kent struck him several times in the back and ribs; Semione struck him several times in the back; Derkowski struck him with his knee in his thighs and on his peroneal nerve; Derkowski applied a leg lock to him; Hudson, Kent, Ferris, and Semitone each took some part in applying resistant handcuffing to Plaintiff; and Ferris physically dragged Plaintiff to a police vehicle utilizing an "underhook escort" grip. PSOF at ¶ 29(a - l). Defendants admit that Officer Fennell, who was the officer in charge at the scene, was present when two officers were "pointing their weapons at Mr. Marcano," saw an officer kneel on Plaintiff in order to get his arm out from underneath him, and saw an officer utilize "a strike" to get Plaintiff's arm out from under his body. DRPSOF at ¶¶ 31, 34.

Plaintiff alleges that his injuries from his arrest included miscellaneous redness, swelling, and abrasions on his body; a laceration above his right eyebrow requiring three stitches; cuts and bruising to his face, forehead, and head; bruising surrounding his right eye; bruising above and below his left eye; bruising on his nose; a bloody nose; injury to his left elbow; injury to his ribs; injury to his back; and injury to his neck. PSOF at ¶¶ 35-

38; see also Plaintiff's Medical Records (Ellis Hospital Records) (Detailing extent of treatment required for Plaintiff's injuries as well as result of numerous scans and x-rays.). Defendants admit that Plaintiff suffered facial abrasions a laceration to his right eyebrow necessitating stitches and that Plaintiff complained of neck and back pain at the emergency room. However, Defendants contend Plaintiff's injuries were not caused by Defendants' actions. DRPSOF at ¶ 38.

Plaintiff was transported to the Schenectady Police Department where police officers photographed his face which revealed multiple abrasions and lacerations. PSOF at ¶¶ 41. Members of the City of Schenectady Police Department then transported Plaintiff to the hospital to receive treatment for his injuries. Id. at ¶ 42.[8]

Before Plaintiff was charged with any crime, Defendant Sheldon received a statement from Sabrina Vega. Ms. Vega attested::

> I am at the Schenectady Police Department talking to Det. Sheldon about an incident that occurred tonight at my home. Tonight I was at my mother's apartment who lives above us on the second floor. My mother was on the first floor and I could hear her screaming my name over and over again. I ran down to the first floor and I could see my son outside. He was in front of the house and I was attempting to get him back into the apartment. My son was screaming at someone but I couldn't see who it was. I was able to pull my son, Efrain Beniquez, back into the first-floor apartment. I asked Efrain what had happened. He told me that a guy was in front of the house and the doors were open. As a guy walked by he gave my son a look in the two of them began to argue.

Pl. Ex. K.

Plaintiff argues that the police had "no complaining witness to the underlying incident" and "knew almost immediately that Mr. Marcano would not be charged with

---

[8]Medical records indicate that besides the stitches, doctor's performed a series of scans and x-rays, all of which revealed no broken bones or other serious injuries. Plaintiff was administered an intramuscular (IM) dose of Toradol and a NSAID (non-steroidal anti-inflammatory drug). He was instructed that if he experienced further pain, he was to take an over-the-counter pain reliever such as Advil or Tylenol.

anything in connection with the underlying incident." PSOF at ¶ 44. Plaintiff claims that, despite this, Sheldon suggested to several of the officers involved in the incident "to charge [Plaintiff] anyway." PSOF at ¶ 46. Defendants deny that Sheldon said this, DRPSOF at ¶ 46, and contend that there existed probable cause to charge Plaintiff with various crimes. In this regard, Plaintiff was charged by Kent with Resisting Arrest; by Hudson with Assault in the Second Degree; and by Savignano with Obstruction of Governmental Administration. DCSOF ¶ 39. No charges were brought against Plaintiff concerning the underlying incident on Paige Street.

There is some dispute as to what happened to Plaintiff after being treated at the hospital. According to Plaintiff, he was transported to Schenectady County Jail pending prosecution on the criminal charges. PSOF at ¶ 48. However, Plaintiff was on parole at the time and there is no dispute that after his arrest, his parole was revoked pending a hearing based upon his conduct on January 7, 2011. DCSOF, ¶ 43; Pl. Ex. P., 5/6/11 Parole Division Decision. The Parole Division's warrant was lodged on January 10, 2011. Pl. Ex. P, p. 5. At the time of the Parole Division's Decision, the Obstruction of Governmental Administration and the Resisting Arrest charges "remained pending" although the Assault charge "was not prosecuted." Id. Plaintiff testified at his 50-h hearing that the Obstruction of Governmental Administration and the Resisting Arrest charges were "dismissed" on April 7, 2011, 50-h Trans., p. 38, but his attorney requested a Certificate of Disposition from the Schenectady City Court regarding the criminal charges and received a response stating: "**No Public Records Found**. No further information is available." Def. Ex. 23 (emphasis in original).

On May 6, 2011, an Administrative Law Judge upheld two of the parole violation

charges brought against Plaintiff: (1) Charge 3- "Alexander Marcano violated rule #8 of the conditions governing his release in that on 1/7/11 at approximately 7:57 PM into the vicinity of 516 Mumford St., Schenectady, NY, he did intentionally attempt to prevent a uniform Schenectady police officer, A.J. Savignano, from questioning him in regards to a person with a firearm call and a directive for Marcano to stop;" and (2) Charge 4- "Alexander Marcano violated rule #8 of the conditions governing his release in that on 1/7/11 at approximately 7:57 PM in the vicinity of 516 Mumford St., Schenectady, NY, he did threaten the safety and well-being of himself and others by intentionally attempting to prevent a uniform Schenectady police officer, A.J. Savignano, from questioning him in regards to a person with a firearm call and a directive for Marcano to stop." DCSOF, ¶ 45. The Administrative Law Judge remanded Plaintiff for a period of 16 months. PSOF, ¶ 53.

Plaintiff was granted a *de novo* hearing on the two sustained charges. DCSOF ¶ 46. The Administrative Law Judge concluded at this second parole hearing that Plaintiff had violated the conditions of his parole "when he intentionally fled from Savignano and Police Officer Hudson as they attempted to stop and speak with him," and sustained the Violation of Release Report for Charges 3 and 4. Pl. Ex. R. Plaintiff was again assessed 16 months of incarceration. Id. Plaintiff has appealed the Administrative Law Judge's decisions.

## III.    DISCUSSION

### a.    Official Capacity Claims

Defendants move to dismiss the official capacity claims against the individual Defendants. "A claim against a government officer in [his or her] official capacity is, and should be treated as, a claim against the entity that employs the officer. . . ." Mathie v.

_Fries_, 121 F.3d 808, 818 (2d Cir. 1997)(citing _Kentucky v. Graham_, 473 U.S. 159, 165-66

(1985)); _see_ _Booker v. Board of Educ., Baldwinsville Central_, 238 F. Supp.2d 469, 475

(N.D.N.Y. 2002)(Munson, S.J.)("The real party in interest in an official capacity suit is the

governmental entity and not the named official.").  Inasmuch as the City of Schenectady is

named as a defendant in this action and sued under _Monell v. Dep't. of Soc. Servs._, 436

U.S. 658, 98 S. Ct. 2018 (1978) for the conduct of the individual defendants, the official

capacity claims against the individual defendants are dismissed as redundant. _See_

_Booker_, 238 F. Supp.2d at 475  ("[D]istrict courts have dismissed official capacity claims

against individuals as redundant or unnecessary where _Monell_ claims are asserted against

an entity.").

> **b.**    **New York State Constitutional Claims**

The parties argue over whether Plaintiff asserts cognizable claims under the New

York State Constitution, but the Amended Complaint is silent as to any such claim.  At

most, the Amended Complaint contains headings for each Cause of Action with some

indicating that they are brought under "New York State Law."  Assuming that these

headings can be inferred as alleging New York State constitutional claims, the claims are

dismissed because they are also asserted as Section 1983 and/or state common law

claims.  _Krug v. County of Rennselaer_, 559 F. Supp.2d 223, 247-28 (N.D.N.Y. 2008); _see_

_Clayton v. City of Poughkeepsie_, 2007 WL 2154196, at *7 (S.D.N.Y. June 21,

2007)("[V]arious federal courts in this circuit have held that there is no private right of

action under the New York State Constitution where ... remedies are available under §

1983." )(citations and interior quotation marks omitted); _Flores v. City of Mount Vernon_, 41

F. Supp.2d 439, 46–47 (S.D.N.Y. 1999) ("[N]o private right of action exists for violations of

the New York State Constitution where a Plaintiff has alternative damage remedies available.").

    **c.**    **False Arrest**

Both sides seek summary judgment on the claims that the police unjustifiably stopped Plaintiff, unjustifiably pursued him, and unjustifiably detained him on January 7, 2011.  These  claims are for "false arrest" under the U.S. Constitution or New York common law.  See Am. Compl., pp. 9-10 (Second Cause of Action, brought pursuant to 42 U.S.C. § 1983); p. 13 (Ninth Cause of Action, brought pursuant to "New York State Law"). The elements necessary to prove false arrest under 42 U.S.C. § 1983 are "substantially the same" as the elements for false arrest under New York law, save for the requirement that the constitutional tort be under color of state law.  Posr v. Doherty, 944 F.2d 91, 96 (2d Cir.1991) (quoting Raysor v. Port Auth. of New York and New Jersey, 768 F.2d 34, 39–40 (2d Cir.1985)).  To establish a claim for false arrest, Plaintiff must show that: (i) he was intentionally confined; (ii) he was conscious of the confinement; (iii) he did not consent to the confinement; and (iv) the confinement was not privileged.  Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012); Saving v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003); accord Shain v. Ellison, 273 F.3d 56, 67 (2d Cir. 2001).

       **1.**    **Attempt to Stop Plaintiff on Mumford Street**

The first issue is whether Plaintiff presents a plausible false arrest claim arising from Savignano and Hudson's initial attempt to stop him on Mumford Street.  The Fourth Amendment protects against "unreasonable searches and seizures" by the government, U.S. Const. amend. IV, including "brief investigatory stops of persons . . .  that fall short of traditional arrest."  United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L.

Ed.2d 740 (2002).   However, "[b]efore determining whether a search or seizure is unreasonable, courts must find that a . . . seizure occurred." Reyes v. City of New York, --- F. Supp.2d ----, 2014 WL 173412, at * 2 (S.D.N.Y. Jan.16, 2014).  "A seizure triggering the protection of the Fourth Amendment occurs once an officer has 'by means of physical force or show of authority,  . . . in some way restrained the liberty of a citizen.'" United States v. Freeman, 735 F.3d 92, 96 (2d Cir. 2013) (quoting Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968)); see United States v. Simmons, 560 F.3d 98, 105 (2d Cir. 2009)("A seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained.") (citation omitted).  In order to be seized by a "show of authority," an individual must objectively feel that he is not free to leave. California v. Hodari D., 499 U.S. 621, 627–28, 111 S. Ct. 1547, 113 L. Ed.2d 690 (1991)(citing United States v. Mendenhall, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed.2d 497 (1980); Michigan v. Chesternut, 486 U.S. 567, 108 S. Ct. 1975, 100 L. Ed.2d 565 (1988); Immigration and Naturalization Serv. v. Delgado, 466 U.S. 210, 104 S. Ct. 1758, 80 L. Ed.2d 247 (1984)).   "[T]o comply with an order to stop—and thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority, for there is no seizure without actual submission." United States v. Baldwin, 496 F.3d 215, 218 (2d Cir. 2007) (citation and internal quotation marks omitted); see United States v. Cuthbert, 466 Fed. Appx. 46, 46-47 (2d Cir. March 16, 2012)(Summary Order);  United States v. Hightower, 387 Fed. Appx. 118, 119-20 (2d Cir. Aug. 02, 2010)(Unpublished Decision).  "Whether conduct constitutes submission to police authority will depend, as does much of the Fourth Amendment analysis, on 'the totality of the circumstances—the whole picture.'" Baldwin, 496 F.3d at 219 (citation

omitted).  "[I]t is the nature of the interaction, and not its length, that matters." Id. (citations omitted).[9]

The totality of the circumstances do not indicate that Plaintiff was seized within the meaning of the Fourth Amendment when the police first encountered him.  Even assuming that a reasonable person would not have felt free to leave when the officers shined their spot light on him, told him to stop, got out of the car, commanded that he show his hands, and even attempted to physically hold him when he and the officers slipped on the ice after Plaintiff began to flee, Plaintiff did not submit to this show of authority.  Rather, it is undisputed that Plaintiff successfully fled when the officers first confronted him on Mumford Street.  Like the defendant in Baldwin, Plaintiff did not submit to police authority and, therefore, no actionable Fourth Amendment seizure occurred at the initial confrontation.  Plaintiff's Section 1983 false arrest claims arising from this interaction are dismissed.

Plaintiff argues, however, that even if not seized within the meaning of the Fourth Amendment, he was seized under New York's common law because the police lacked justification for the encounter under the rules established in People v. De Bour, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976), as reaffirmed in People v. Hollman, 79 N.Y.2d 181, 581 N.Y.S.2d 619, 590 N.E.2d 204 (1992).  See People v. Spencer, 84 N.Y.2d 749, 753-54 (N.Y. 1995);[10] see e.g. Hollman, 79 N.Y.2d at 195–96 (De Bour and its

_____

[9]In Baldwin, police officers pulled over a Chevrolet Impala that Baldwin was driving but, as the officers approached the car on foot, the car sped away.  Baldwin, 496 F.3d at 217.  The Second Circuit found that Baldwin had not  been seized during the stop. The Circuit stated: "Our ruling is not predicated on the brevity of Baldwin's stop, but on the fact that the stop itself did not constitute submission." Id. at 219.

[10]("[A]s in cases involving the forcible detention of pedestrians, the instant stop of defendant was a seizure.  At the moment defendant was pulled over the encounter lost the consensual characteristics which mark permissible first level intrusions under the De Bour four-part test.  The question we must address in this

(continued...)

progeny are rooted not in federal or state constitutional law, but in state common law.).
The Court disagrees.

"De Bour delineated four levels of permissible police intrusion, the propriety of each depending upon the circumstances presented. The court noted that various levels of permissible police intrusion must be 'reasonably related in scope to the circumstances which rendered its initiation permissible.' If the officers' conduct in this case falls into one of the four levels of permissible police intrusion, plaintiff's confinement was justified." Hall v. City of White Plains, 185 F. Supp.2d 293, 299 (S.D.N.Y. 2002) (quoting De Bour, 40 N.Y.2d at 223).

> The first De Bour level authorizes a police officer to approach a citizen to request information where there is "some objective credible reason not necessarily indicative of criminality." [De Bour, 40 N.Y.2d] at 223, 386 N.Y.S.2d 375, 352 N.E.2d 562. The questioning should be brief and specific, relating, for example, to an inquiry as to the person's identity, destination or reason for being in the area. See Hollman, 79 N.Y.2d at 191, 581 N.Y.S.2d 619, 590 N.E.2d 204.

> However, once the officer's questioning becomes accusatory and the inquiry focuses upon the possibility of criminality, the stop passes beyond a mere request for information and to the second level, the common-law right to inquire. This level, which goes beyond a simple request for information, "is activated by a founded suspicion that criminal activity is afoot." De Bour, 40 N.Y.2d at 223, 386 N.Y.S.2d 375, 352 N.E.2d 562. The questioning may be invasive and of an accusatory type, which would lead a person to reasonably believe that he is the focus of an investigation. Hollman, 79 N.Y.2d at 191–92, 581 N.Y.S.2d 619, 590 N.E.2d 204. Under this level, the officer may interfere with a citizen to the extent necessary to gain explanatory information, but may not make a forcible seizure.

> The third level permits an officer to forcibly stop and detain a person for questioning where the police officer has reasonable suspicion that a suspect has committed, is committing, or is about to commit a crime. Reasonable suspicion has been defined as that "quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand." People v. Cantor, 36 N.Y.2d 106, 112–113, 365 N.Y.S.2d 509, 324 N.E.2d 872 (1975). The right to stop is a limited seizure and permits a significant interruption of

---

[10](...continued)
case is whether that seizure was reasonable.")

a person's liberty of movement. *Id.* "To justify such an intrusion, the police officer must indicate specific and articulate facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or unparticularized hunches will not suffice." Id. at 113, 365 N.Y.S.2d 509, 324 N.E.2d 872 (citing Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968)).

The fourth and final level authorizes a police officer to arrest and take one into custody where the officer has probable cause to believe that the person has committed a crime or an offense in his presence. Id.; N.Y. Crim. Proc. Law § 140.10.

Id. at 299-300.

Assuming that the initial police confrontation with Plaintiff reached the third De Bour level by virtue of the fact that the police told Plaintiff to stop, commanded that he show his hands, and grabbed at his foot when they fell with the intent to stop and question him about his involvement in the Paige Street incident, the police had a sufficient justification for their conduct. Officers Savignano and Hudson were responding to a dispatcher's radio transmission concerning a police investigative report of a black male who had brandished a gun[11] and left a specific location on Paige Street where an altercation had allegedly occurred. Under the collective knowledge doctrine, Savignano and Hudson justifiably relied on the transmission. See Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007)(police officers may rely upon information gained from other officers in making their probable cause assessment); Savino v. City of N.Y., 331 F.3d 63, 74 (2d Cir. 2003)(same). The report indicated that the suspect had jumped over a fence and was heading toward Mumford Street, and the dispatcher directed that "all units" were to respond, thus indicating the seriousness of the issue. Savignano and Hudson arrived on Mumford Street moments after receiving the dispatch and observed Plaintiff, one of the

---

[11]Despite Plaintiff's argument that the original call to the police about the incident on Paige Street did not mention a gun, the video recording from the officer's car clearly demonstrates that the dispatcher's radio transmission included "a gun" as a part of its description. See Exh. 1, 007KVY00 (13:59:49).

few individuals on the street during a snow storm, walking alone in a direction away from,

yet near, where the suspect had reportedly jumped over the fence.  Further, Plaintiff

roughly matched the limited description of the suspect in that the officers observed that

Plaintiff was a dark-skinned male.  These facts, taken together, provided Savignano and

Hudson with a reasonable suspicion to believe that Plaintiff had committed the crime of

menacing under New York law, <u>see</u> N.Y. Penal Law § 120.14[1],[12] thus entitling them to

stop Plaintiff for inquiry.  <u>See</u> <u>People v. Benjamin</u>, 51 N.Y.2d 267, 270-71 (N.Y. 1980).[13]

Further, the fact that the suspect was reported to have possessed a gun moments earlier

provided sufficient justification for the officer's command to "let me see your hands," and

_____

[12]New York Penal Law § 120.14[1],  Menacing in the Second Degree, provides:

A person is guilty of menacing in the second degree when:

1. He or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm.

[13]In <u>Benjamin</u>, the New York Court of Appeals wrote:

A police officer is entitled, and in fact is duty bound, to take action on a radio call. However, if a defendant later raises a legal challenge as to the permissible extent of such action, the People must take the initiative to show that in view of all the circumstances the action taken was justified.  This can be done by sufficient explanation of the source of the call and proof of its reliability or alternatively by showing that the information conveyed was so specific and congruous with that which was actually encountered that its reliability could have been assumed.

In either event, these cases illustrate that a radioed tip may have almost no legal significance when it stands alone, but that when considered in conjunction with other supportive facts, it may thus collectively, although not independently, support a reasonable suspicion justifying intrusive police action. The instant case demonstrates that this additional support can, as well, be provided by factors rapidly developing or observed at the scene.

A police officer directed to a location by a general radio call cannot reasonably be instructed to close his eyes to reality--neither the officer nor justice should be that blind. The officer was rightfully and dutifully on the scene and could not ignore possible indications of criminality, nor is there any logical reason for him to reject the natural mental connection between newly encountered facts and the substance of the radio message. More importantly, there certainly is no justification for holding that an officer in such a situation cannot take note of a significant occurrence indicating a possible threat to his life, merely because the call which directed him to the scene was in and of itself an insufficient predicate for intrusive action against a particular person.

55 N.Y.2d at 270-71 (citations omitted).

did not amount to a more intrusive detention than was reasonably necessary under the circumstances.  See Benjamin, 51 N.Y.2d at 271;[14] see e.g. Terry, 392 U.S. at 30 (During a Terry Stop, an officer may conduct a "pat-down frisk" if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot *and* that the persons with whom he is dealing may be armed and presently dangerous."); United States v. Alexander, 907 F.2d 269, 272 (2d Cir. 1990).[15] Based on the specific and articulated facts upon which the police based their determination to stop Plaintiff, along with the logical deductions that a trained officers would draw including the need to protect themselves and the public from an individual who had potentially brandished a firearm moments earlier, Savignano and Hudson's initial attempt to stop Plaintiff on Mumford Street for further investigation was reasonable, and thus privileged.

---

[14]The Court of Appeals wrote in Benjamin,

It is quite apparent to an experienced police officer, and indeed it may almost be considered common knowledge, that a handgun is often carried in the waistband. . . .  Although [a suspect's actions] may be consistent with innocuous or innocent behavior, it would be unrealistic to require [an officer], who had been told that gunmen might be present, to assume the risk that the [suspect's] conduct was in fact innocuous or innocent. Such an assumption would be at odds with his reasonably acquired belief that he was in danger and his constitutionally authorized action. It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety.

55 N.Y.2d at 271 (citation omitted).

[15]In Alexander, the Court wrote:

There are no hard and fast rules for evaluating the conduct of law enforcement agents conducting investigative stops. See Nargi, 732 F.2d at 1106; Harley, 682 F.2d at 402.  A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists. See Adams v. Williams, 407 U.S. 143, 146, 92 S. Ct. 1921, 1926, 32 L .Ed.2d 612 (1972); Terry, 392 U.S. at 23–24, 27, 88 S. Ct. at 1881–1882, 1883; United States v. Jackson, 652 F.2d 244, 249–50 (2d Cir.), cert. denied, 454 U.S. 1057, 102 S. Ct. 605, 70 L. Ed.2d 594 (1981). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry, 392 U.S. at 27, 88 S. Ct. at 1883.

907 F.2d at 272.

Moreover, once Plaintiff took immediate flight, the officers' reasonable suspicion that Plaintiff was the suspect who had brandished a gun moments earlier on Paige Street was heightened. See Baldwin, 496 F.3d at 220 (holding probable cause existed after a suspect did not comply with orders to show his hands and thereafter fled from police);[16] United States v. Martinez-Gonzalez, 686 F.2d 93, 100 (2d Cir. 1982) ("[P]robable cause to arrest [Defendant] . . . arose once [Defendant] turned [from approaching officers] and fled."); Vanhoesen , 552 F. Supp.2d at 343 ("The police were justified in their attempt to stop Defendant on Second Street, . . . and thus to pursue him when he fled."); Morgan v. Superintendent, 88 F. Supp.2d 317 (E.D.N.Y. 2000) (Plaintiff's flight combined with failing to stop after uniformed police ordered him to do so contributed to totality of the circumstances, which in turn satisfied the probable cause required for his subsequent arrest); Wieder v. City of New York, 2013 WL 1810751, at *8 (E.D.N.Y. Apr. 29, 2013)(Plaintiff's flight which was observed by officers, when combined with other evidence, went towards establishing probable cause for his arrest); see e.g. Illinois v. Wardlow, 120 S. Ct. 673, 674 (2000) (holding that an individual's unprovoked flight upon noticing the police, in conjunction with his presence in a high crime area, may constitute reasonable suspicion); United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975) (erratic

---

[16]This is true even when there does not exist a reasonable basis to stop an individual. In Baldwin, the Second Circuit noted that the Supreme Court has "implicitly authorized a defendant's seizure based on events occurring after issuance of an unreasonable order to stop," and explained that the Second Circuit has reaffirmed its adherence to this implicit rule:

> An individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention. See Florida v. Royer, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed.2d 229 (1983). "But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed.2d 570 (2000).

Baldwin, 496 F.3d at 220 (quoting United States v. Muhammad, 463 F.3d 115, 123 (2d Cir. 2006)).

driving or obvious attempts to evade police may, in conjunction with other activity, support

reasonable suspicion). Thus, assuming *arguendo* that the initial pursuit and attempt to

detain Plaintiff by grabbing his foot constituted a common law confinement, the action was

privileged. Any New York common law false arrest claim arising from any "confinement"

by being confronted by the police, and by Hudson grabbing Plaintiff's foot, is dismissed.

2.    **Pursuit of Plaintiff**

For the reasons discussed above, there exists no cognizable Fourth Amendment

false arrest claim for the period that the officers pursued Plaintiff because he was not

seized during this time. See Hodari D., 499 U.S. at 628 (Hodari was not seized until he

was tackled.); Brendlin v. California, 551 U.S. 249, 262, 127 S. Ct. 2400, 2409, 168 L.

Ed.2d 132 (2007)("a fleeing man is not seized until he is physically overpowered"); County

of Sacramento v. Lewis, 523 U.S. 833, 844, 118 S. Ct. 1708, 140 L. Ed.2d 1043 (1998)

("Police pursuit in attempting to seize a person does not amount to a 'seizure' within the

meaning of the Fourth Amendment."); Salamacha v. Lynch, 165 F.3d 14, 1998 WL

743905 (2d Cir.1998) (police chase does not create Fourth Amendment seizure unless

and until there is physical seizure of the person); United States v. Eldridge, 2007 WL

5041414, at *2 (W.D.N.Y. Sept. 05, 2007)("[T]he Fourth Amendment prohibits

"unreasonable searches and seizures", not "unreasonable approaches and chases. . . ."

Defendant was not "seized" for purposes of the Fourth Amendment until he was

apprehended by the police. . . ."); see e.g. United States v. Swindle, 407 F.3d 562, 573 (2d

Cir.2005) ("we are compelled to conclude that Swindle was seized only when the police

physically apprehended him"); United States v. Vanhoesen , 552 F. Supp.2d 335, 344

(N.D.N.Y. 2008)("Under the holding in Hodari D., Defendant was not seized within the

meaning of the Fourth Amendment at the time he discarded the drugs [while he was fleeing].");  United States v. Batista, 1999 WL 33450, at *3–4 (S.D.N.Y. Jan.27, 1999) (no seizure of bag containing drugs abandoned during flight from police).  Although Hudson grabbed Plaintiff's foot after the three fell on this ice in an attempt to seize Plaintiff, that attempt was unsuccessful and thus no seizure occurred.  Any Section 1983 false arrest claim for the pursuit is dismissed.

To the extent Plaintiff was "confined" under New York common law while being pursued by the police, the officers' pursuit was privileged.   As indicated above, Plaintiff's immediate flight when confronted by the police justifiably raised the officers' initial reasonable suspicion to a higher level.  Further, this flight, when combined with Plaintiff's motion of reaching for his waistband as he fled, justifiably raised the officer's reasonable suspicion to believe that Plaintiff was the suspect who had brandished a gun moments earlier.  See Hodari D., 499 U.S. at 629 (grounds for a stop may be based on events that occur after an  order to stop is given and disobeyed); see e.g. United States v. Manuel, 64 Fed. Appx. 823, 2003 WL 21105366, at *2-3 (2d Cir. May 15, 2003)(reasonable suspicion to stop defendant existed where the police had received an anonymous call reporting that men bearing guns had congregated on a particular "high crime" street corner in Buffalo, New York, and police subsequently observed a suspicious bulge in the defendant's pants' pocket indicative of a firearm); United States v. Sanders, 2000 WL 268577, at *1 (2d Cir. Mar. 9, 2000)(reasonable suspicion to stop and frisk an individual found where, inter alia, an officer noted that [the suspect's] gaze remained fixed over his shoulder at the police checkpoint while he adjusted [an] object in his waistband," and the officer "testified that he knew from his police training and experience that firearms commonly are carried in

waistbands.")(citing United States v. Jackson, 175 F.3d 600, 601-02 (8th Cir. 1999), cert.

denied, 120 S. Ct. 80 (1999) (looking back at police during flight and clutching something

at left side supported finding of reasonable suspicion)); United States v. Grant, 2008 WL

897805, at *4  (E.D.N.Y., March 31, 2008)(police had a reasonable suspicion to stop and

pat down defendant when they heard gunshots indicative of criminal activity; police

observed defendant acting in a furtive manner shortly after the gunshots; police saw

defendant adjust a bulge in his waistband to the right side of his body; the bulge had the

outline of a handgun; defendant clutched the bulge; and, upon seeing a police officer,

defendant sought to avoid him);  see also United States v. Padilla, 548 F.3d 179, 187–88

(2d Cir. 2008)(reasonable suspicion existed where defendant acted "ostensibly

suspicious" when he and two others walked onto an isolated, dark path at night rather than

stay on the lighted sidewalks in a "high- crime" neighborhood;  exited the path "into a

desolate area near another wooded lot which was . . . well-suited for a robbery;" and

"reach[ed] underneath his jacket and shirt, adjust[ed] something in the center of his

waistband, and continue[d] walking."); cf. United States  v. Doughty, 2008 WL 4308123, at

*5 (S.D.N.Y. Sept. 19, 2008 )("It is true that the waistband area is an area of the body

where illegal guns are often carried, and police officers must be observant of hand

motions in this area for their own protection."); People v. Muller, 278 A.D.2d 423, 717

N.Y.S.2d 659 (N.Y. App .Div. 1st Dept.1994) (common police knowledge as to practice of

carrying guns in waistband); People v. Montague, 175 A.D.2d 54, 572 N.Y.S.2d 310 (N.Y.

App. Div. 1st Dept.1991) ("We can hardly ignore what is probably apparent to every police

officer, that a waistband is the telltale hiding place for a gun").  Thus, assuming arguendo

that the pursuit constituted a New York common law confinement, the action was

privileged.  Any false arrest claim arising from the pursuit is dismissed.

### 3.  Perimeter Confinement

Plaintiff also argues that he was subjected to an actionable "confinement" during the time that the officers set up a perimeter and surrounded him.  The Court disagrees. Assuming, *arguendo*, that Plaintiff was aware that the officers had surrounded him before he was actually captured, the officers' actions were legally justified for the reasons discussed above.  Any false arrest claim for this period is dismissed.

### 4.  Actual Seizure

Turning to the actual seizure, the question is whether the police had probable cause to arrest Plaintiff.  "[T]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether the action is brought under state law or under § 1983."  Weyent v. Okst, 101 F.3d 845, 852 (2d Cir.1996); see also Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002) ("A § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest.").  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Devenpeck v. Alford, 125 S. Ct. 588, 593 (2004)(citing Maryland v. Pringle, 540 U.S. 366, 371 (2003)).  "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Gonzales v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (citing Weyant, 101 F.3d at 852).  As indicated above, police officers may rely upon

information gained from other officers in making their probable cause assessment.

Zellner, 494 F.3d at 369; Savino, 331 F.3d at 74.

The relevant inquiry is whether "probable cause existed to arrest a defendant" and "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006). "A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." Hahn v. County of Otsego, 820 F. Supp. 54, 55 (N.D.N.Y. 1993), aff'd, 52 F.3d 310 (2d Cir. 1995). "[T]he eventual disposition of the criminal charges is irrelevant to the probable cause determination." Hahn, 820 F. Supp. at 55 (citing Pierson v. Ray, 386 U.S. 547, 555 (1967)). Once a police officer has probable cause, he need not explore "every theoretically plausible claim of innocence before making an arrest." Ricciuti v. New York City Transit Authority, 124 F.3d 123, 128 (2d Cir. 1997).

Here, Hudson and Savignano obtained probable cause to arrest Plaintiff for menacing in violation of N.Y. Penal Law § 120.14[1] when: (1) the SIU received a complaint that a black male had brandished a firearm and then jumped over fence heading toward Mumford Street, (2) the SIU communicated the complaint to the police dispatcher; (3) the police dispatcher communicated the complaint, a description of the suspect, the allegation that the suspect had jumped over a fence and was headed to Mumford Street, and directed "all units" to respond; (4) Hudson and Savignano encountered Plaintiff a few moments later walking alone on Mumford Street close to, but moving away from, the location where the suspect had jumped over the fence; (5) Plaintiff

roughly matched the description of the suspect in that he was a male with dark skin; (6) Plaintiff immediately fled upon encountering the police; and (7) Plaintiff reached for his waistband while fleeing.   Moreover, these facts were communicated to the other officers involved in Plaintiff's arrest by the combination of the radio transmissions from the dispatcher and Savignano.  This, in turn, provided sufficient probable cause for Officers Donovan, Semione, Fennell, Ferris, Derkowski, and Pardi to assist in Plaintiff's eventual arrest under the collective knowledge doctrine.  Even assuming that Officer Kent was unaware of why he was chasing Plaintiff, see PSOF, ¶ 20; but see DRPSOF ¶ 20, the fact that Plaintiff fled from police by running through various yards, jumped over at least one fence and then hid under vegetation on the property behind the fence, and appeared to have resisted police efforts to take him into custody both on Mumford Street and under the tree where he was hiding, provided Officer Kent, as well as the other officers with sufficient probable cause to arrest Plaintiff for resisting arrest and criminal trespass. See NY Penal Law §§ 205.30;[17] 140.05;[18] 140.10(a).[19]  For these reasons, Plaintiff's false arrest claims under federal and state law arising from his physical arrest and confinement are

---

[17]NY Penal Law § 205.30 provides: "A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an authorized arrest of himself or another person."

[18]NY Penal Law § 140.05 provides: "A person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises."  "Premises" includes the term "building," and any real property.  NY Penal Law § 140.00(1).  A person "enters or remains unlawfully" in or upon premises "when he is not licensed or privileged to do so."  NY Penal Law § 140.00(5).

[19]NY Penal Law § 140.10(a) provides in pertinent part:

**§ 140.10 Criminal trespass in the third degree**

A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property

(a) which is fenced or otherwise enclosed in a manner designed to exclude intruders.

dismissed.[20]

### 5. Confinement in the Schenectady County Jail.

To the extent that Plaintiff argues that Defendants are liable for false imprisonment in the Schenectady County Jail after he was arrested, Defendants are entitled to summary judgment on that claim. A claim of false arrest covers the time period from arrest through arraignment, after which time the claim becomes one for malicious prosecution. See Wallace v. Kato, 549 U.S. 384, 389-90 (2007). As indicated, the police had sufficient justification to arrest and charge Plaintiff and, therefore, to confine him pending criminal prosecution. See Fincher v. County of Westchester, 979 F. Supp. 989, 998 (S.D.N.Y. 1997)("Under New York law, the torts of false arrest and false imprisonment are synonymous."). Moreover, the Parole Division lodged a warrant against Plaintiff on January 10, 2011. Even assuming that Plaintiff had not been arraigned by then,[21] any confinement from this point forward would be attributable to the New York State Division of Parole, not the Defendants. Consequently, any false arrest claim for the period of detention from January 7, 2011 until arraignment or January 10, 2011 (whichever was first) is dismissed.

### d. **Malicious Prosecution**

Defendants also move for summary judgment on Plaintiff's malicious prosecution claims. To state a claim for malicious prosecution under either § 1983 or New York law, Plaintiff must establish, *inter alia*, "termination of the proceeding in [the accused's] favor."

---

[20]Because the Court has dismissed all false arrest claims based upon the record presented in this motion, the Court has no reason to address Defendants' argument regarding the Parole Division ALJ's determinations and the doctrine of collateral estoppel.

[21]Plaintiff has provided no indication of when he was arraigned, and it is significant that Plaintiff testified at his Parole Revocation Hearing that he does not remember being arraigned on the criminal charges. Pl. Ex. B, p. 38.

Green v. Mattingly, 585 F.3d 97, 104 (2d Cir. 2009). Whether termination is deemed favorable to the accused is determined in accordance with applicable state law, here, New York law. Hygh v. Jacobs, 961 F.2d 359, 367 (2d Cir.1992). Proceedings are "terminated in favor of the accused" when their final disposition is such as to indicate the accused is not guilty. DiBlasio v. City of New York, 102 F.3d 654, 657 (2d Cir.1996). "Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." Fulton v. Robinson, 289 F.3d 188, 196 (2d Cir. 2002). Even a dismissal "in the interest of justice" under New York Criminal Procedure Law § 170.40 "cannot provide the favorable termination required as the basis for a claim of malicious prosecution." Hygh, 961 F.2d at 368 (citing Ryan v. N.Y. Tel. Co., 62 N.Y.2d 494 (1984)).

Plaintiff's attorney requested a Certificate of Disposition of the offenses with which Plaintiff was charged on January 7, 2011 and received a letter stating that none existed. DCSOF ¶ 40. Plaintiff contends that this response "is wholly consistent with Mr. Marcano's claim that he was arrested and that the charges filed against him [were] disposed of in his favor" and the record sealed. PRDCSOF, ¶ 40. However, while Plaintiff may be correct that arrest records are sometimes sealed following a favorable disposition of criminal charges against an accused (such as after a dismissal in the interest of justice), Plaintiff has presented no evidence that the dismissal in his case indicated that he was not guilty of the charges. Thus, Plaintiff has failed to present sufficient evidence to establish the "favorable termination" element of his malicious prosecution claims related to his criminal charges. Accordingly, any such malicious prosecution claims are dismissed.

To the extent that Plaintiff asserts a malicious prosecution claim in the context of the Parole Division proceeding when he argues that the defendants are responsible for his 16-month Parole Division assessment, the claim is dismissed for lack of a favorable termination.

### c. Malicious Abuse of Process

Defendants also seek summary judgment on Plaintiff's claims for malicious abuse of abuse of process. "In the criminal context, malicious abuse of process is by definition a denial of procedural due process. . . . Procedural due process forbids the use of legal process for a wrongful purpose." Abreu v. Romero, 2010 WL 4615879, at *8 (S.D.N.Y. Nov. 9, 2010)(citation omitted). To state a claim for malicious abuse of process, Plaintiff must prove Defendant: 1) employed regularly issued legal process to compel performance or forbearance of some act; 2) with intent to do harm without excuse or justification; 3) to obtain a collateral objective outside the legitimate ends of the process. See Devarnne v. City of Schenectady, 2011 WL 219722, at *3 (N.D.N.Y. Jan. 21, 2011) (citing Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003)).

"The pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." Lopez v. City of New York, 901 F. Supp. 684, 691 (S.D.N.Y.1995) (citing PSI Metals v. Firemen's Ins. Co., 839 F.2d 42, 43 (2d Cir.1988)). In other words, Plaintiff "must claim that [Defendants] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." Savino, 331 F.3d at 77. "In New York . . . wrongful [collateral] purposes have included economic harm, extortion, blackmail, and retribution." Ketchuck v. Boyer, 2011 WL 5080404 at *7 (N.D.N.Y. Oct. 25, 2011); see Abreu, 2010 WL 4615879, at *8; Bd. of Educ. of

<u>Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n</u>, 38 N.Y.2d 397, 404 (1975).

Plaintiff has presented no evidence upon which a reasonable fact finder could conclude that Officers Kent, Hudson or Savignano issued criminal complaints against Plaintiff to obtain a collateral objective outside the legitimate ends of the process. Plaintiff's arguments to the contrary consist of conclusory, nonspecific recitations of the required elements of the claim, and fail to identify any factual support for the proposition that the defendants harbored any ulterior motive in their actions. Furthermore, there is no evidence that Kent, Hudson or Savignano had any involvement in the prosecution of the criminal case against Plaintiff after they issued the criminal complaints. Accordingly, all abuse of process claims are dismissed.

> ### d. **Excessive Force**

Defendants contend that the § 1983 excessive claims must be dismissed because the officers used no more force than was necessary to execute Plaintiff's lawful arrest. The motion must be denied as it pertains to Defendants Hudson, Pardi, Savignano, Donovan, Semione, Fennell, Ferris, Derkowski and Kent, but granted as to Defendant Sheldon.

> The Fourth Amendment [ ] protects the right to be free from an officer's use of unreasonable (excessive) force during the course of an arrest. <u>Tracy v. Freshwater</u>, 623 F.3d 90, 96 (2d Cir. 2010) (citing <u>Graham v. Connor</u>, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed.2d 443 (1989)). Like the test for probable cause, the Fourth Amendment reasonableness test is an objective one. <u>Id.</u> (quoting <u>Bryant v. City of New York</u>, 404 F.3d 128, 136 (2d Cir. 2005)). The Court disregards the arresting officer's subjective intent and instead considers "whether, in light of the totality of the circumstances faced by the arresting officer, the amount of force used was objectively reasonable at the time." <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 123 (2d Cir. 2004) (citing <u>Graham</u>, 490 U.S. at 397). The objective reasonableness of any use of force depends on the balance between governmental interests

justifying the force and the individual's interest in his liberty and bodily integrity. See [Tolan v. Cotton, ——U.S. ——, 134 S. Ct. 1861, —— L. Ed.2d ——, 2014 WL 1757856, *4 (May 5, 2014) (per curiam)] (quoting Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed.2d 1 (1985)). Courts must consider, at a minimum, the nature and severity of the crime leading to the arrest, whether the suspect posed an immediate threat to the safety of another person, and whether the suspect was resisting arrest or attempting to flee. Tracy, 623 F.3d at 96. Because police officers often decide how much force to use in "split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-" courts must evaluate the record "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (quoting Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006)).

Sterlin v. City of New York, 2014 WL 2560595, at *4 (S.D.N.Y. June 06, 2014).

Even though the defendant officers executed a lawful arrest of Plaintiff, it is a disputed question of material fact whether the level and amount of force used was reasonable under the circumstances. Accepting Plaintiff's version of events, he offered no physical threat to the officers or resistance to being arrested, but he was tackled and physically retrained by Hudson; Kent struck him several times in the back and ribs; Semione struck him several times in the back; Derkowski struck him with his knee in his thighs and on his peroneal nerve; Derkowski applied a leg lock to him; Hudson, Kent, Ferris, and Semione each took some part in roughly applying resistant handcuffing to Plaintiff; and Ferris physically dragged Plaintiff to a police vehicle. This is sufficient to establish a *prima facie* case of constitutionally impermissible excessive force against these officers. See Graham, 490 U.S. at 395; Kerman v. City of New York, 261 F.3d 229, 240 (2d Cir. 2001)(When a court is presented with a summary judgment motion on an excessive force claim, the court must deny the motion when disputed facts exist which are "material to a determination of reasonableness.").

Further, "all law enforcement officials have an affirmative duty to intervene to

protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." <u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2d Cir.1994). For an officer to be held liable, he must have had a realistic opportunity to intervene to prevent the violation from happening. <u>Id.</u> (citing <u>O'Neill v. Krzeminski</u>, 839 F.2d 9, 11–12 (2d Cir.1988)). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." <u>Id.</u> Inasmuch as Defendants Pardi, Savignano, Donovan, and Fennell were present during Plaintiff's arrest and the alleged use of excessive force, it is possible that Plaintiff could establish Section 1983 failure to intervene claims against them. There is no evidence, however, that Defendant Sheldon was present during the arrest. Any claim for excessive force or failure to intervene against him is dismissed.

The Court will not apply qualified immunity on the Section 1983 excessive force and failure to intervene claims at this time. Because of the factual disputes concerning the level of force that was used and whether Plaintiff resisted arrest or presented an objectively reasonable threat to the officers' safety, qualified immunity as to the excessive force claims is denied.

### e. State Law Assault and Battery

Defendants also move for summary judgment on Plaintiff's state law assault and battery claims. "Under New York Law, an 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact." <u>Girden v. Sandals Int'l</u>, 262 F.3d 195, 203 (2d Cir. 2001). To recover damages for assault, "there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact." <u>Stanley v.</u>

Amalithone Realty, Inc., 31 Misc.3d 995, 1006, 921 N.Y.S.2d 491 (Sup. Ct. N.Y. Cnty.

2011)(citing Holtz v. Wildenstein & Co., 261 A.D.2d 336, 336, 693 N.Y.S.2d 516 (1st Dep't

1999)). "[A] battery is an intentional wrongful physical contact with another person without

consent," Girden, 262 F.3d at 203, "either personally or by means of an instrumentality."

Aberbach v. Biomedical Tissue Servs., Ltd., 48 A.D.3d 716, 718, 854 N.Y.S.2d 143 (2d

Dep't 2008).

"To succeed on an assault or battery claim in the law enforcement context, a

plaintiff must demonstrate that defendants' conduct 'was not reasonable within the

meaning of the New York statute concerning justification for law enforcement's use of

force in the course of performing their duties.'" Cuellar v. Love, 2014 WL 1486458, at * 13

(S.D.N.Y. April 11, 2014)(quoting Torres–Cuesta v. Berberich, 511 F. App'x 89, 91 (2d

Cir. 2013) in turn quoting Nimely v. City of New York, 414 F.3d 381, 391 (2d Cir. 2005));

see Kavazanjian v. Rice, 2008 WL 5340988 at * 6-7 (E.D.N.Y. 2008).[22]  Essentially, the

Fourth Amendment excessive force standard applies to assault and battery claims against

a police officer under New York law. Humphrey v. Landers, 344 Fed. App'x 686, 688

(2009)("Except for § 1983's requirement that the tort be committed under color of state

law, the essential elements of excessive force and state law assault and battery claims are

substantially identical.")(quoting Posr v. Doherty, 944 F.2d 91, 94–95 (2d Cir.1991));

Sterlin, 2014 WL 2560595, at *4.  Because Plaintiff's arrest was lawful, to defeat the

motion for summary judgment he must proffer evidence demonstrating the threat, or use,

of force was objectively unreasonable.  Nimely, 414 F.3d at 391; Cuellar, 2014 WL

---

[22]("To prove a civil battery claim against a police officer, a plaintiff is required to show that the officer made bodily contact, that the contact was offensive, and that [the officer] intended to make the contact. Additionally, the plaintiff is required to prove that [the officer's] conduct was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties [i.e., N.Y. Penal Law § 35.30(1) ].") (citing Nimely, 414 F.3d at 391).

1486458, at * 13.

Plaintiff's claims for common law assault arising from the officers' actions in telling Plaintiff to stop, pointing their guns at him, and telling him not to move (including Defendant Pardi's statement not to move "or I'll blow your fucking head off"), were not objectively unreasonable under the circumstances. As indicated, it was objectively reasonable for the officers to tell Plaintiff to stop on Mumford Street. Further, the officers had probable cause to believe that they were arresting an individual who had brandished a gun moments earlier and fled when confronted by the police. They therefore had a legal justification to take defensive measures such as drawing their guns and commanding Plaintiff not to move in order to protect themselves and their fellow officers. Defendants' motion for summary judgment on Plaintiff's claims for common law assault is granted.

Plaintiff's claims for common law battery arising from Hudson and Savignano's initial attempt to stop Plaintiff on Mumford Street, including trying to grab hold of him when they all slipped on the ice, must also be dismissed. Because the officers had a legal justification to stop and detain Plaintiff, no actionable battery occurred by this action.

Turning to the actual arrest, the claims for common law battery against Defendants Hudson, Semione, Ferris, Derkowski, and Kent survive Defendants' motion for summary judgment. For the reasons discussed above with regard to the Section 1983 excessive force claims, there are questions of fact whether the actions taken by Hudson, Semione, Ferris, Derkowski, and Kent were reasonable under the circumstances. Further, neither side has addressed whether a cognizable state law claim of failure to intervene could exist against Pardi, Savignano, Donovan, or Fennell. Therefore, the Court declines to rule on the issue. Nonetheless, Plaintiff has provided no factual allegations from which

a reasonable fact finder could conclude that Defendant Sheldon committed a battery upon Plaintiff or is liable for failing to intervene and, therefore, any such claims are dismissed.

### f. Intentional & Negligent Infliction of Emotional Distress

Defendants move for summary judgment on Plaintiff's claims for intentional and negligent infliction of emotional distress. Under New York law, a claim for intentional infliction of emotional distress has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Howell v. N.Y. Post Co., 81 N.Y.2d 115, 121(1993); accord Capellupo v. Nassau Health Care Corp., 97 A.D.3d 619, 623 (2d Dep't 2012). Further,"[a] cause of action for either intentional or negligent infliction of emotional distress must be supported by allegations of conduct by a defendant 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Howell v. New York Post Co., 81 N.Y.2d 115, 122 (1993) (quoting Murphy v American Home Prods. Corp., 58 N.Y.2d 293, 303 (1983)) (1993); see De Ratafia v. County of Columbia, 2013 WL 5423871, at *11 (N.D.N.Y. Sept. 26, 2013)(citing Tartaro v. Allstate Indem. Co., 56 A.D.3d 758, 759 (2nd Dep't 2008); Chime v. Sicuranza, 221 A.D.2d 401, 403 (2nd Dep't 1995); Burrell v. Int'l Assn. of Firefighters, 216 A.D.2d 346, 356 (2nd Dep't 1995)). Determining whether the alleged conduct is sufficiently outrageous to be actionable is a question of law for the Court. Holwell, 81 N.Y.2d at 122.

Even viewing the facts in the light most favorable to Plaintiff, nothing any of the Defendants did arose to the level of conduct so outrageous in character, and so extreme

in degree, as to go beyond all possible bounds of decency as to be regarded as atrocious and utterly intolerable in a civilized community. Accordingly, Defendants' motion must be granted on the claims for intentional and negligent infliction of emotional distress.[23]

### g. Constitutional Claims Against City of Schenectady

#### 1. § 1983 - Failure to Adequately Train and Supervise

Defendants also move to dismiss Plaintiff's § 1983 Failure to Adequately Train and Supervise claims against the City of Schenectady. See Am. Compl., ¶¶ 82-86. It is well settled that a municipality cannot be held liable under § 1983 solely on a theory of *respondeat superior*. Monell, 436 U.S. at 692. "Because municipalities may not be held vicariously liable for the actions of their employees, a claim against a municipality must be premised on the theory that it maintained a policy, practice, or custom that caused the plaintiff's constitutional injury." Cuellar, 2014 WL 1486458, at *9 (citing Monell, 436 U.S. at 694). Courts in this Circuit apply a two prong test for § 1983 claims brought against a municipality. Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir.1985) (citation omitted). First, the plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." Id. (emphasis added) (citation omitted). Second, the plaintiff must establish a "'direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation.'" Hayes v. Cnty. of Sullivan, 853 F.

---

[23]Further, Plaintiff has not alleged conduct by Defendants sufficient to support a negligent infliction of emotional distress claim. The Amended Complaint contains no allegations of negligent conduct, but merely reasserts the intentional tort claims of assault and battery and intentional infliction of emotional distress under a negligence heading. Plaintiff cannot simply re-cast intentional tort claims under a negligence theory. See Marmelstein v. Kehillat New Hempstead, 11 N.Y.3d 15, 20 (2008) (trial court dismissed negligent infliction of emotional distress claim for lack of an allegation that defendant committed any negligent acts); see also Schmidt v.. Bishop, 779 F. Supp. 321, 324–25 (S.D.N.Y.1991) ("New York Courts have rejected uniformly such attempts to transmogrify intentional torts into 'negligence.'").

Supp.2d 400, 439 (S.D.N.Y. 2012) (quoting City of Canton v. Harris, 489 U.S. 378, 385,

109 S. Ct. 1197, 103 L. Ed.2d 412 (1989)).

> To satisfy the first requirement, a plaintiff must prove the existence of either:
>
> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

Cuellar, 2014 WL 1486458, at *10 (quoting Moray v. City of Yonkers, 924 F. Supp. 8, 12

(S.D.N.Y.1996) (internal citations and quotation marks omitted).  "Although a plaintiff is not

required to identify an express rule or regulation to establish a Monell claim, proof of 'a

single incident alleged in a complaint, especially if it involved only actors below the

policy-making level, does not suffice to show a municipal policy.'" Id. (quoting DeCarlo v.

Fry, 141 F.3d 56, 61 (2d Cir.1998) and citing City of St. Louis v. Praprotnik, 485 U.S. 112,

123, 127 (1988) (plurality opinion)); see Oklahoma City v. Tuttle, 471 U.S. 808, 823-24

(1985)("Proof of a single incident of unconstitutional activity is not sufficient to impose

liability under Monell.").  "In the end, therefore, a plaintiff must demonstrate that, through

its deliberate conduct, the municipality was the moving force behind the alleged injury." Id.

(citing Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008)) (internal quotation marks

omitted).

### A.  Failure to Train

"[W]hen city policymakers are on actual or constructive notice that a particular

omission in their training program causes city employees to violate citizens' constitutional

rights, the city may be deemed deliberately indifferent if the policymakers choose to retain

that program." <u>Connick v. Thompson</u>, —— U.S. ——, ——, 131 S. Ct. 1350, 1360, 179 L. Ed.2d 417 (2011). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." <u>Id.</u> (internal quotation marks and citation omitted).

Plaintiff asserts that "as a result of the City of Schenectady's improper and inadequate training of its officers Plaintiff suffered injuries. This failure constituted a policy and custom of the City of Schenectady." <u>See</u> Am. Compl., ¶ 86. However, beyond this conclusory statement that his injuries resulted from the City of Schenectady's failure to adequately train, Plaintiff presents no evidentiary support for this proposition. "The mere allegation that the municipality failed to train its employees properly is insufficient to establish a municipal custom or policy." <u>Neighbor v. Covert</u>, 68 F.3d 1508, 1512 (2d Cir. 1995), <u>cert. denied</u>, 516 U.S. 1174 (1996) (citing <u>Dwares v. City of New York</u>, 985 F.2d 94, 100 (2d Cir. 1993)); <u>see also</u> <u>Canton v. Harris</u>, 489 U.S. 378, 389, 109 S. Ct. 1197, 12015, 103 L. Ed.2d 412 (1989) ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."). Indeed, Plaintiff has neither provided evidence of a particular omission in the City of Schenectady's training program that would cause City employees to violate citizens' constitutional rights by the use of excessive force, nor a pattern of similar constitutional violations such to demonstrate deliberate indifference for purposes of failure to train. Thus, Defendants' motion is granted with respect to the inadequate training theory of <u>Monell</u> liability.

### B. Failure to Supervise

> To hold a municipality liable under a failure to supervise claim, a plaintiff must demonstrate facts showing a constitutional violation and policymakers' reaction to it. [Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 127 n. 8 (2d Cir. 2004)]. "[D]eliberate indifference may be established by a showing that policymaking officials deliberately ignored an obvious need for supervision." Id. (citing Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir.1995)). To show "policymakers were 'knowingly and deliberately indifferent to the possibility that its police officers were wont' to violate the constitutional rights of arrestees," id. at 127 (quoting Fiacco v. City of Rensselaer, 783 F.2d 319, 326 (2d Cir. 1986)), a plaintiff must show that "'the need for better supervision to protect against constitutional violations was obvious'" but the municipal policymakers "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct," id. (quoting Vann, 72 F.3d at 1049).

Cuellar, 2014 WL 1486458, at *11.

Plaintiff has provided insufficient evidence from which a reasonable fact finder could conclude that City of Schenectady officials "deliberately ignored an obvious need for supervision" of its officers, that its officers were "wont to violate the constitutional rights of arrestees," or that circumstances existed from which "the need for better supervision to protect against constitutional violations was obvious." Plaintiff's conclusory allegations are insufficient to defeat summary judgement, and he has failed to present facts to support the existence of a policy, custom, or practice of inadequately supervising police officers. Accordingly, Defendants' motion is granted with respect to the inadequate supervision theory of Monell liability .

## h. State Law Claims Against the City of Schenectady

Plaintiff's Twelfth, Thirteenth and Fourteenth Causes of Action assert state law claims against the City of Schenectady. See Am. Compl., ¶¶ 111-123. Defendants move for summary judgment on each claim.

### 1. Respondeat Superior

The Twelfth Cause of Action asserts a *respondeat superior* claim "for harm resulting to the Plaintiff as a result of the acts of its employees." Am. Compl. ¶ 114.

Although a municipality cannot be held vicariously liable on a section 1983 claim, under New York state law, a municipality may be held vicariously liable on state law claims asserted against individual officers under a theory of *respondeat superior.* See Linson v. City of New York, 98 A.D.3d 1002, 1003 (2d Dep't 2012); Eckardt v. City of White Plains, 87 A.D.3d 1049, 1051 (2d Dep't 2011). This includes claims against a municipality for the actions of its officers in committing assault and battery. Woods v. Town of Cheektowaga, 2012 WL 5288767, at * 7 (W.D.N.Y. Oct. 23, 2012). Because there are viable battery claims against some of the individual officers, Defendants' motion relative to the Twelfth Cause of Action is denied.

### 2. Negligent Hiring and Retention

Plaintiff's Thirteenth Cause of Action asserts that the City of Schenectady is liable under a theory of negligent hiring and retention because it "failed to adequately investigate the background of the individual Defendants and knew or reasonably should have known that these individual defendants were unfit for the type of job responsibilities and duties which they were hired and retained to perform." Am. Compl. ¶ 117. "In New York, an employer may be held liable for negligent hiring or retention where one of its employees caused injures to a third party 'when the employer has either hired or retained the employee with knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm.'" Cuellar, 2014 WL 1486458, at *12 (quoting Borden v. Capital Dist. Transp. Auth., 307 A.D.2d 1059, 1061, 763 N.Y.S.2d 860 (3d Dep't 2003)). However, the record is devoid of evidence demonstrating any of the defendants' propensity for behavior antithetical to serving as a police officer, let alone propensity for violence or the use of excessive force. See Cuellar, 2014 WL 1486458, at *12; Nouel v.

<u>325 Wadsworth Realty LLC</u>, 112 A.D.3d 493, 494, 977 N.Y.S.2d 217 (1st Dep't 2013).

Plaintiff merely argues that City of Schenectady is liable because "the individual Defendant

were employees acting as police officers and detectives of the City of Schenectady at the

time of incident herein," <u>see</u> Pl. Mol at 25 (dkt. #50-1), but does not discuss the hiring or

circumstances impacting the continued retention of any of the defendants.  Accordingly,

summary judgment dismissing this claim is granted.

### 3.  Negligent Training and Supervision

The Fourteenth Cause of Action asserts a claim for negligent training and

supervision.   A municipality may be held liable for negligently training or supervising its

law enforcement officers.  <u>Barr v. Cnty. of Albany</u>, 50 N.Y.2d 247, 257 (1980).   However,

Plaintiff offers no evidence that the City of Schenectady's training program or supervision

of its officers were deficient, or that the City was in some way negligent.  Plaintiff's

conclusory allegations do not create genuine issues of material fact, <u>see</u> <u>Barr</u>, 50 N.Y.2d

at 258, and, therefore, summary judgment is appropriate dismissing the Fourteenth Cause

of Action.

## IV.    CONCLUSION

For the reasons discussed above, Plaintiff's motion for partial summary judgment

[Dkt. # 50] is **DENIED.**  Defendants' cross-motion for summary judgment [Dkt. # 56] is

**GRANTED in part and DENIED in part**. The motion is granted **DISMISSING** all claims

against the individual defendants in their official capacities; all claims that may have been

asserted under the New York State Constitution; the 42  U.S.C. §1983 claim of Excessive

Use of Force/Failure to Intervene against defendant Steven Sheldon; the Second Cause

of Action (42  U.S.C. §1983 - False Arrest and Detention); the Third Cause of Action (42

U.S.C. §1983 - Malicious Prosecution); the Fourth Cause of Action (42 U.S.C. §1983 - Malicious Abuse of Process); the Fifth Cause of Action (42 U.S.C. §1983 - Failure to Adequately Train and Supervise); all New York State law Assault claims; the New York State law Battery/Failure to Intervene claim against defendant Steven Sheldon; the Seventh Cause of Action (New York State law - Intentional Infliction of Emotional Distress); the Eighth Cause of Action (New York State law - Negligent Infliction of Emotional Distress); the Ninth Cause of Action (New York State law - False Arrest and Detention); the Tenth Cause of Action (New York State law - Malicious Prosecution); the Eleventh Cause of Action (New York State law - Malicious Abuse of Process); the Thirteenth Cause of Action (New York State law - Negligent Hiring and Retention); and the Fourteenth Cause of Action (New York State law - Failure to Adequately Train and Supervise). The motion is denied on Plaintiff's: 42 U.S.C. § 1983 Excessive Force/Failure to Intervene claims against Defendants Hudson, Pardi, Savignano, Donovan, Semione, Fennell, Ferris, Derkowski and Kent in their individual capacities; New York State law Battery/Failure to Intervene claims against Defendants Hudson, Pardi, Savignano, Donovan, Semione, Fennell, Ferris, Derkowski and Kent in their individual capacities; and *respondeat superior* claim against the City of Schenectady on the remaining New York State law Battery/Failure to Intervene claims.

**IT IS SO ORDERED.**

Dated: August 13, 2014

Thomas J. McAvoy
Senior, U.S. District Judge